UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PETROWORKS SA, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| VS. | } | CIVIL ACTION NO. H-07-1919 |
| | } | |
| JAMES C ROLLINGS, | } | |
| | } | |
| Defendant. | } | |

## ORDER GRANTING PRELIMINARY INJUNCTION

Pending before the court is Plaintiff Petroworks, S.A. ("Petroworks") Application for Preliminary Injunction. A preliminary injunction hearing was held on June 28 and 29, 2007. Having reviewed the evidence and the applicable law, and for the reasons explained below, the court ORDERS that Petroworks's Application for Preliminary Injunction is GRANTED, subject to the posting of a bond in the amount of one hundred thousand dollars and zero cents ($100,000.00).

## I.   Background and Relevant Facts

This is a breach of contract case over the refurbishment of several workover/drilling rigs. In late March 2006, Petroworks hired Defendant James C. Rollings ("Jake") to refurbish four rigs it had purchased from third parties. A significant factor in Petroworks's decision to buy the four rigs was Jake's representation that his company, Jake's Equipment and Repair, could refurbish the rigs for $150,000.00 each. (Rosales Aff. Doc. 8.) Gabriel Rosales ("Rosales"), Vice President of Petroworks, testified that Jake represented that he knew a supplier with a surplus of the parts necessary to refurbish these types of rigs. This fact, Rosales claimed, resulted in the parties agreeing to a fixed $150,000 price per rig. Petroworks

and Jake orally agreed to this deal, and Petroworks purchased three out of the four rigs from Texas International Oilfield Tools ("Texas International") and a fourth rig at a subsequent auction.  The parties made verbal agreements as to the deadlines for each rig, and the payment terms included: 50% in advance, 25% upon fifty percent completion, and 25% when the rig is inspected and approved by Petroworks but before shipment.  By June 9, 2006, Jake had already been paid the total sum of $286,750.00 in advance for the refurbishment of the four rigs.  (*See* Jake's Equipment & Repair Statement, dated June 12, 2006, Pl.'s Prelim. Inj.  Hr'g.  Ex.  3.)

Within weeks of the delivery of the four rigs, Jake had fallen behind the agreed schedule.  Jake was having serious cash flow problems, and venders, whose supplies were critical for the refurbishment project, were refusing to furnish the necessary parts.  Petroworks, alarmed at the apparent delay in its order, directed its agent, Ramde International, Inc. ("Ramde"),  to seek out solutions to the problem.  As a result, Ramde, on behalf of Petroworks, began paying most of the suppliers of the parts for the first and second rig directly and having the parts delivered to Jake to install on the rigs.

Jake acknowledged that he had failed to meet the deadlines upon which the parties had agreed.  Jake delivered the first rig after the deadline expired and only 85% complete.  In an effort to salvage the remaining refurbishment projects, the parties reconvened and worked out an amended schedule for services for the last three rigs (hereafter, "Rig 1," "Rig 2," and "Rig 3.").  They signed a "Memorandum of Understanding" in which the deadlines were extended to accommodate Jake.  (Memorandum of Understanding, dated September 22, 2006, Pl.'s Prelim. Inj.  Hr'g Ex.  5.)  The new deadline for Rig 1 was October 31, 2006, and the new deadline for Rig 2 was December 11, 2006.  (*Id*.)  Rosales and Jake agreed that Jake would complete the refurbishment of Rig 3 once he had completed the refurbishment of Rig 2.  (Rosales Aff., Doc.

8.)

Jake again missed all of the deadlines.  Desperately needing the rigs to satisfy its own contractual obligations, Petroworks sent its agent to retrieve the remaining three rigs.   Jake returned Rig 1, which was less than fifty percent complete.  Rig 2 was returned with almost no work having been performed.  Jake refused, however, to relinquish "Rig 3," claiming that Petrowork owed $375,652.24 for work already performed on the other rigs.

Petroworks filed a breach of contract claim in state court and sought to enjoin Jake from interfering with Petroworks's ownership rights to Rig 3.  The state court judge issued a temporary restraining order.  A few hours before the preliminary injunction hearing in state court, Jake's removed the case based on diversity jurisdiction. After Jake's removal, Petroworks filed an original complaint in federal court seeking the current injunctive relief.   The two cases were then consolidated in this court

In this preliminary injunction hearing, Plaintiff seeks not only an order to enjoin Jake from interfering with Petroworks's ownership rights of  Rig 3, but also a mandatory injunction requiring Jake to turn over Rig 3 to Petroworks.  Jake objects to the necessity for injunctive relief, but if such relief is granted, requests that Petroworks  be required to post a bond in the amount of $375,652.24.  The fair market value of Rig 3, according to testimony by Petroworks, is approximately $100,000.00.

**II.    Analysis**

In seeking a preliminary injunction, Petroworks must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury or harm for which there is no adequate remedy at law; (3) threatened injury to the party seeking the injunction outweighs any harm that the injunction might cause to the party to be enjoined; (4)

that the injunction will not disserve the public interest. *Lake Charles Diesel, Inc. v. GMC*, 328 F.3d 192, 195-96 (5th Cir. 1999); *see also Sugar Busters LLC v. Brennan*, 177 F.3d 258 (5th Cir. 1999). A preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has "clearly carried the burden of persuasion" on all four requirements. *GMC*, 328 F.3d at 196 (quoting *Mississippi Power & Light Co. v. United Gas Pipeline Co*., 760 F.2d 618, 621 (5th Cir. 1985).

Here, Plaintiff has met its burden of persuasion on all four prongs. The court addresses each in turn.

(1)    Success on the Merits

Plaintiff claims that it has no outstanding debts to Jake, and, to the contrary, that Jake's breach of contract has cost Petroworks substantial damages. For the purposes of issuing this preliminary injunction, the court agrees. The evidence at the hearing showed that the parties agreed to a firm, $150,000 price for each rig. This price is reflected not only in invoices provided by Jake to Petroworks, but also through the credible testimony of Rosales, who testified regarding Petroworks's understanding of the deal. The fixed nature of the price is also reflected in the Memorandum of Understanding, which states that "Jake quoted the budget for *total refurbishment* of those rigs, and payment terms for that refurbishment job as its [Invoices]." (Memorandum of Understanding, Ex. 5 (emphasis added).) Moreover, the Memorandum contains a provision for "new cash advances" in which the parties agreed that "[a]ny new cash advance to Jake shall be made in the form of direct payment from [Petroworks] to vendors . . .[but] *in that form must not exceed the sum of [$75,000] for each rig* and will be credited to any balance due to Jake." (*Id.* (emphasis added).) This language suggests that Petroworks was agreeing to pay vendors, as it had done before the parties entered into the Memorandum of

Understanding, up to the amount left on the contract, $75,000 (fifty percent of $150,000).   In other words, Petroworks was not agreeing to pay additional costs by offering to buy the parts directly from the vendors; rather, Jake agreed that Petroworks could be credited these payments against the firm amount that Petroworks agreed to pay.  The parties did not agree, as Jake appears to contend, that payment would be assessed using a "cost-plus" analysis. Nor does the inclusion of the term "estimated costs" in the four invoices undermine the understanding among the parties that the price of $150,000 per rig was firm.

Jake, by his own admission, stated that no work had been performed on Rig 3. Nor had work been completed on Rig 2.  Indeed, none of the rigs were finished completely.  Yet, Petroworks has paid, in advance, over $280,000 as well as hundreds of thousands of dollars to Jake's vendors for supplies.  Accordingly, the court finds that Petroworks is likely to succeed in proving that it has more than satisfied its monetary obligations to Jake.

(2)   Substantial threat of irreparable injury or harm

Petroworks has suffered and will continue to suffer irreparable harm if an injunction is not issued ordering Jake to relinquish possession of Rig 3.  Generally, contractual rights are not enforced by writs of injunction because irreparable harm is rarely shown when a suit for damages for breach of contract is available.  *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex.App.–Dallas 1989, no writ) (noting that irreparable harm is of such nature that the injured party cannot be adequately compensated in a form measured by any pecuniary standard).   In this case, however, Plaintiff's request for injunctive relief concerns possession of a rig that is currently decaying on Jake's property.  Rig 3 is dismantled and being exposed to weather that depletes its economic value on a daily basis.  The more time that passes, the more damage is done, and Petroworks fears that Rig 3 will be rendered useless.  Jake has no

plans to refurbish and make use of the rig; rather, he is holding it merely as collateral on the alleged debts owed on the first two rigs, of which Jake has already relinquished possession. At the hearing Petroworks offered the testimony of Rosales that it has critical need for this rig due to its intended use in Columbia. Rosales also testified that his own and Petroworks's reputation has suffered incalculable harm because of his inability to produce this rig. Monetary damages would not adequately compensate Petroworks in this situation. *See Westside Airways, Inc. v. J.R. Aircraft Corp.* , 694 S.W.2d 100 (Tex.App.–Houston [14th Dist.] 1985, no writ) (holding that a writ of sequestration, although available, would not adequately remedy the owners for the loss of their property and the resulting potential business that the aircraft could generate).

(3)   <u>Balancing of the harms and the public interest</u>

The threatened injury to Petroworks far outweighs any potential harm to Jake in this case. Indeed, Jake stands to benefit from the mandatory injunction. Putting Rig 3 back into use mitigates any damages that may be assessed against him for Petrowork's breach of contract claims. Jake claims that he has a mechanic's lien on Rig 3 for unpaid work expended on the first two rigs. He claims to be amenable to turning over Rig 3, but requires Petroworks to post a bond for the $375,652.24, the amount he claims to be owed. Petroworks vigorously disagrees with both the assertion of a valid mechanic's lien and the allegations that it owes Jake any money. The court need not ultimately resolve whether Jake's has a valid mechanic's lien because a bond posted in the fair market value of Rig 3, claimed to be $100,000.00, would be more than adequate to protect his alleged security interest. In other words, Jake's security interest in Rig 3 is only equal to the fair market value he could receive were he were to sell the rig on the open market. This interest is not, therefore, diminished by converting it into a monetary bond, equal in all respects other than form to the interest he claims using Rig 3 as collateral. Accordingly,

there is no harm by issuing the mandatory injunction in this matter.  The balance of equities clearly favors Plaintiff, and the issuance of a bond in the amount of $100,000 adequately protects Defendant.  This equitable result does not disserve the public interest in any way.

## III.    Conclusion

Accordingly, the court, after examining and considering the application, affidavits and response, and after a hearing, **FINDS** as follows:

1.    Plaintiff will suffer the following immediate and irreparable injury, loss, or damage:  Defendants refuse to allow Plaintiff to remove Plaintiff's Rig Ideco H-37 #3 with a KM-105-270-GH 105' 270,000# 4 legged mast, Ideco Rambler BIR-5525, 5 axle Carrier, Rotary Drive 445/65R22.5 tires, the pulleys, and all of its components and parts (collectively defined herein as the "rig").   If Plaintiff had possession of the rig, it could have the rig refurbished and put the rig to work, which would earn Plaintiff approximately $3,000 net per day in rent from the rig.  Plaintiff will lose business and revenues because of Defendants' refusal to allow Plaintiff to remove the rig from Defendants' premises, and Plaintiff's business reputation will be damaged.

2.    Defendants have threatened imminent and irreparable harm to the rig and Plaintiff's rights by claiming a purported "lien" against the rig until Plaintiff pays money to Defendants, by refusing Plaintiff full access to and possession of the rig, and by allowing the rig to be exposure to the weather and other elements.  Defendants will continue to engage in these activities if the court does not grant a preliminary injunction.

3.    This injury to Plaintiff is irreparable because the rig and Plaintiff's right to use the rig are unique and irreplaceable, so that it will be impossible to accurately measure, in monetary terms, the damages caused by Defendants' conduct.

4.      Plaintiff has provided Defendants with sufficient prior notice of the Court hearing on Plaintiff's application for a preliminary injunction.

5.      Defendants will not suffer undue hardship or loss because of the issuance of a preliminary injunction.

Therefore, it is hereby **ORDERED** that:

6.      Defendants, and their respective officers, agents, servants, employees, attorneys, and all persons acting in concert with them be restrained from 1) holding or purporting to hold a foreclosure of the rig, or any part thereof, or 2) attempting or purporting to sell, convey, transfer, assign or deliver any or all of the rig, or 3) attempting or purporting to create or cause to be created any liens against the rig, or 4) removing the rig from Defendants' premises, or 5) removing any parts, equipment or components from the rig, or 6) removing from Defendants' premises any parts, equipment or components that have been previously removed from the rig, or 7) interfering with, preventing or obstructing Plaintiff or its agents, servants, representatives, employees or third party contractors, including, but not limited to, Innovative Energy Services, Inc., from entering the premises where the rig and its components and parts are located and removing the rig and its components and parts from the premises; and Defendants are **ORDERED** to preserve and protect the rig and all of its components and parts from, without limitation, the weather and other elements, theft, and/or other damage or loss during the pendency of this action and until the rig and all of its components and parts are delivered to Plaintiff or its agents, servants, representatives, employees or third party contractors, or until further order of the Court; and Defendants are **ORDERED** to allow Plaintiff and its agents, servants, representatives, employees or third party contractors, including, but not limited to, Innovative Energy Services, Inc. access upon Defendant's premises at 15813 A Tomball

Parkway, Houston, Texas 77086 during normal business hours, in order for them to remove the rig and its components and parts from said premises, upon not less than two hours prior notice.

It is further **ORDERED** that

7.     Plaintiff shall post a bond in the amount of $100,000.00.

**SIGNED** at Houston, Texas this 29th day of June, 2007.


Melinda Harmon
United States District Judge